IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA 2010 MAY 25 AM 9:19

AUGUSTA DIVISION

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          CR 110-075
                                  )
REGINALD LONNEL CRAY              )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused Defendant Reginald Lonnel Cray ("Cray") of one count of Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2), and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).[1] (Doc. no. 1). The matter is now before the Court because Cray filed a motion to suppress evidence obtained from the search of his residence and requested a Jackson-Denno hearing to determine whether any statements he made during the execution of the challenged search warrant should be suppressed. (Doc. nos. 26, 31).

This case was re-filed after the dismissal without prejudice of similar charges against Cray in United States v. Cray, CR 109-074 (S.D. Ga. June 4, 2009) (hereinafter "CR 109-074"). In Cray's prior case, he brought the same motion to suppress that is now currently before the Court. (CR 109-074, doc. nos. 22, 45, 46). Indeed, Cray concedes "that the issues in this [current] Motion have been litigated and resolved in the dismissed case of USA v. Cray, CR 109-74. However, Counsel re-files these motions so as to perfect the record that

---

[1] A Forfeiture Allegation has also been brought against Cray. (Doc. no. 1).

he will not be deemed to have waived these issues in this Indictment." (Doc. no. 26, p. 1 n.1).

The Court held an evidentiary hearing in the prior case on September 8, 2009, at which time the Court heard testimony from Special Agent Richard McManaway ("SA McManaway"), an officer with Immigrations and Customs Enforcement ("ICE"). When the motion to suppress was filed in the current case, the Court issued an Order directing the parties to explain why, in light of the prior proceedings, another evidentiary hearing was necessary in this case. (Doc. no. 30, p. 3 n.2). Defendant responded with a request for a new evidentiary hearing, (doc. no. 31), and the government opposed that request (doc. no. 34).

As such, the Court now relies on the facts developed at the hearing held on September 8, 2009, and for the reasons stated more fully herein, **REPORTS** and **RECOMMENDS** that Defendant's request for a new evidentiary hearing be **DENIED**, and that the motion to suppress be **DENIED**.

## I.   NO NEW EVIDENTIARY HEARING NEEDED

As previously noted, the Court held an evidentiary hearing on the suppression issues in the prior case before entering its Report and Recommendation. However, when Cray's counsel re-filed the motion to suppress so as to perfect the record (doc. no. 26, p. 1 n.1), the Court gave Cray and the government an opportunity to move for an evidentiary hearing on the motion to suppress filed in this case (doc. no. 30, p. 3 n.2). The Court explained that any such request must be supported by particularized briefing as to why the Court should hold a second evidentiary hearing on the same issues which were previously explored during the September 8, 2009 hearing in the prior case. (Id.).

In response to the Court's Order, Cray maintains that a new evidentiary hearing is required because of a lack of testimony concerning the events that led to his return to his home from Fort Gordon on the morning of the search. Cray also reasserts the arguments that his movements were restricted during the search, that his pockets were searched, and that at the end of the search, he received a direction from military authorities to return to "duty status." (Doc. no. 31, pp. 1-2). The government maintains that sufficient evidence was heard at the September 8, 2009 evidentiary hearing, and that no new laws exist to support a re-examination of the same. (Doc. no. 34).

The Court finds no reason for holding an evidentiary hearing based on Cray's motion. That is, the decision to grant or deny a request for an evidentiary hearing on a motion to suppress is left to the Court's discretion. United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000); United States v. Sneed, 732 F.2d 886, 888 (11th Cir. 1984) (per curiam). "[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994) (affirming denial of a motion for evidentiary hearing on motion to suppress) (citation omitted). A district court should grant a request for an evidentiary hearing when the moving papers, including the affidavits, are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985) (quoting United States v. Poe, 462 F.2d 195, 197 (5th Cir. 1972)). However, a district court is not compelled to grant an evidentiary hearing when a defendant promises to allege at a hearing what he has failed to allege in his motion papers. Cooper, 203 F.3d at 1285. Thus, the burden is upon Cray to

3

allege facts that would, if proven true, entitle him to relief. Lewis, 40 F.3d at 1332. This Court has a Local Rule that addresses the proper means by which to allege those facts:

> Every factual assertion in a motion, response, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion. Where allegations of fact are relied upon that are not supported by the existing record, supporting affidavits shall be submitted.

Loc. Crim. R. 12.1.

Here, despite the Court's April 28, 2010 Order, Cray has not provided the necessary evidentiary detail in his current motion to explain why the Court should hold a second evidentiary hearing on the same issues which were previously explored during the September 8, 2009 evidentiary hearing. In addition, to the extent Cray now alleges that he was told that he was under arrest during the progression of the search of his residence, his argument fails. Cray provides no affidavit in support of his statement, and more importantly, the record from the evidentiary hearing – as more thoroughly discussed below – provides otherwise. Similarly, Cray's argument that there was a lack of prior testimony as to the events that led to his return to his home from Fort Gordon on the morning of the search, also fails.[2] Cray's statement is not supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence. Contrary to Cray's assertion, he, not the government, has the burden to allege facts that would, if proven true, entitle him to relief. Accordingly, Cray's request for a second evidentiary hearing should be denied.

---

[2] Notably, Defendant had the opportunity to address this issue at the September 8, 2009 evidentiary hearing, but did not. In fact, not only did Defendant fail to raise this issue at the hearing, he did not object to this issue in his objections to the Report and Recommendation.

4

## II.    FACTS

ICE agents, pursuant to an ongoing investigation of unlawful importation of prohibited items, including child pornography, determined that on March 25, 2008, Cray subscribed to a Child Pornography Website ("the Website"). (CR 109-074, doc. no. 54, pp. 2-5). They also determined that Cray was using a certain email address and credit card, and that he was accessing the Website through an identified IP address and email account. (Id.). The ICE agents were able to further identify that Cray's IP address was controlled by AT&T Internet Services Southeast ("AT&T"). (Id.).

During the investigation, ICE agents issued various Customs Summonses, pursuant to 19 U.S.C. § 1509, to obtain information concerning their investigation. (See generally CR 109-074, doc. no. 54). 19 U.S.C. § 1509 provides in pertinent part:

(a) Authority

In any investigation or inquiry conducted for the purpose of . . . insuring compliance with the laws of the United States administered by the United States Customs Service, the Secretary (but no delegate of the Secretary below the rank of district director or special agent in charge) may--

. . . .

(2) summon, upon reasonable notice--

(A) the person who--

(i) imported, or knowingly caused to be imported, merchandise into the customs territory of the United States, . . .

(B) any officer, employee, or agent of any person described in subparagraph (A);

(C) any person having possession, custody or care of records relating to the importation or other activity described in subparagraph (A); or

(D) any other person he may deem proper;

to appear before the appropriate customs officer at the time and place within the customs territory of the United States specified in the summons (except

5

that no witness may be required to appear at any place more than one hundred miles distant from the place where he was served with the summons), to produce records, as defined in subsection (d)(1)(A) of this section, and to give such testimony, under oath, as may be relevant to such investigation or inquiry; and

. . . .

(d) Special procedures for third-party summonses

(1) For purposes of this subsection--

(A) The term "records" includes those–

. . . .

(ii) regarding which there is probable cause to believe that they pertain to merchandise the importation of which into the United States is prohibited.

. . . .

(B) The term "summons" means any summons issued under subsection (a) of this section which requires the production of records or the giving of testimony relating to records. Such term does not mean any summons issued to aid in the collection of the liability of any person against whom an assessment has been made or judgment rendered.

(C) The term "third-party recordkeeper" means–

(i) any customhouse broker, unless such customhouse broker is the importer of record on an entry;

(ii) any attorney; and

(iii) any accountant.

The government asserts that ICE agents issued the following Customs Summonses:

(1) A Customs Summons to AT&T dated March 27, 2008. In response to the Customs Summons, AT&T disclosed that the geographical address for the subject IP address was 4686 Red Leaf Way, Martinez, Georgia. (Id. at 3).

(2) A Customs Summons to Georgia Power on February 6, 2009, requesting the subscriber information associated with Cray at the subject address. In response, Georgia Power disclosed that Olivia Cray (Cray's wife) had a Georgia Power account at the subject address. (Id. at 4).

(3) A Customs Summons on February 12, 2009, to AT&T requesting subscriber and associated information relating to the address, name, account number,

6

email address, phone number, service status and log-in times from January 15 to the date of the summons, for Cray and Olivia Cray, at the Red Leaf address. (Id.).

(4)     A Customs Summons on March 3, 2009, to First National Bank ("FNB") requesting Cray's bank statements for March and April 2008 concerning a payment transaction of $79.99 to a particular merchant account from Cray. The Customs Summons also stated the specific credit account number at issue. In response, FNB confirmed that Cray had the subject credit card issued to him at a Fort Gordon P.O. Box,[3] and that a $79.99 charge was made to that account from the merchant account associated with the Website. (Id. at 5).

Having collected the information, SA McManaway prepared an application for a search warrant, and on April 23, 2009, the Court issued a Search Warrant for 4686 Red Leaf Way, Martinez, Georgia. (Id.). The Warrant was executed by federal and state agents on April 28, 2009. (Id.).

At the evidentiary hearing, SA McManaway testified that at approximately 7:00 a.m. on April 28, 2009, surveillance was setup at Cray's residence in order to determine whether anyone was home. (CR 109-074, doc. no. 87, p. 5).[4] At that time, agents determined that nobody was in the residence and that all doors and windows were locked. (Id.). As the agents needed to enter the house, they contacted the Special Assistant United States Attorney ("SAUSA"), who had been operating as a liaison between the army and the investigators, to

---

[3]Cray is in the Army and is employed at Fort Gordon.

[4]An excerpt of the September 8, 2009 hearing concerning the Jackson-Denno hearing was transcribed. (CR 109-074, doc. no. 87). Therefore, where possible, the Court has cited to the transcript. Otherwise, the Court will cite to the time stamp on the Court's recording system, For the Record ("FTR").

determine Cray's whereabouts.[5] (Id.).

From information provided by the SAUSA and from contact with Cray's commanding supervisor, the agents determined that Cray was at work at Fort Gordon. (Id. at 5-6). Two FBI agents contacted Cray at his commanding supervisor's office. (Id.). At that time, Cray was directed to return to his residence. (Id. at 6-7). Cray drove to his residence in his own vehicle; the FBI agents also returned to Cray's residence in their vehicle. (Id. at 7).

Upon Cray's arrival at his residence, SA McManaway identified himself and explained that he and several federal and state agents were at Cray's residence to conduct a search pursuant to a federal search warrant, and he requested that Cray let the agents into his residence. (Id. at 8). SA McManaway testified that he explained to Cray that once inside Cray's residence, he would provide more information to Cray. (Id.). Once inside, SA McManaway repeated that he had a federal search warrant to search Cray's residence for the items listed on the search warrant concerning a child pornography investigation. (Id.). SA McManaway informed Cray that he could leave the residence (but that the search would continue), Cray could remain in the residence but did not have to speak to the agents,[6] or he

---

[5]SA McManaway testified that once it was determined that no one was at Cray's residence, the agents chose to have Cray return to his residence to open the door. (CR 109-074, doc. no. 87, pp. 10-11). SA McManaway further testified that it is standard procedure when access into the residence cannot be made, to have the subject of the investigation return to open the door, or use a ram, or get a lock-smith. (Id.). Because having a resident return to open the door causes the least amount of damage to the property and because the agents knew that Cray was relatively close, they opted to have him return to the residence and open the door. (Id.).

[6]SA McManaway explained that if Cray chose to stay, he would not be permitted to wander freely for safety reasons. (CR 109-074, doc. no. 87, p. 22).

could stay and talk to the agents. (Id. at 8, 13-14, 19, 21-23).

SA McManaway testified that Cray, who appeared to be fully competent, chose to sit down and talk to him. (Id. at 8, 9). SA McManaway testified that Cray understood that he was free to leave. (Id. at 9). According to SA McManaway, they sat down at the kitchen table and began discussing the case. (Id. at 9, 16). SA McManaway stated that during their conversation, Cray was alert and engaged in answering his questions. (Id. at 9). SA McManaway further testified that some time during the conversation, SA McManaway left the table where he and Cray were having the conversation because he believed Cray was being deceptive in his answers, and that he was "skirting" simple questions. (Id. at 17-18, 25). During the search, Cray made admissions related to the charged offenses. (Id. at 25, 26).

As the search of the residence was concluding, Cray was asked to show the contents of his pockets – the agents were looking for any external hard drives, thumb drives, or media devices. (Id. at 14, 17). Upon conclusion of the search, the agents notified the SAUSA that they were "wrapping it up," they would be leaving the residence, that a weapon had been found in the residence, and that they were "done" with Cray. (Id. at 13-15). Additionally, SA McManaway testified that he told the SAUSA that no charges were going to be brought at that time. (Id.). The SAUSA called back approximately 15 minutes later and requested that Cray return to his "duty status." (Id.).

In support of his motion to suppress and request for Jackson-Denno hearing, Cray submitted a conclusory affidavit in which he asserted, "in review of the Government's discovery, the Government appears to have improperly used Customs Summons to obtain

9

evidence to support the search of my home as stated in the pleading on my behalf." (Doc. no. 26, p. 13). He also stated "To the best of my knowledge and understanding, the statements made by my attorney are true." (Id.). Notably, Cray did not provide any specific factual details, nor did he testify at the September 8, 2009 hearing; therefore his conclusory statements have not been subjected to cross-examination.

## III. DISCUSSION

### A. Motion to Suppress the Evidence Obtained from Cray's Home

Cray bases his motion to suppress on the Fourth Amendment's prohibition against unreasonable searches and seizures. According to Cray, the ICE agents improperly used Customs Summonses to obtain the information that was ultimately used to secure the Search Warrant at issue. That is, Cray argues that without the purportedly improperly obtained information, there would not have had sufficient probable cause to support a Search Warrant application.

The government, on the other hand, argues that Cray lacks "standing" to challenge the evidence obtained through Customs Summonses. (CR 109-074, doc. no. 54, pp. 6-7). It further argues that even if Cray had "standing," the Customs Summonses were properly used as an investigative tool, and that the Right to Financial Privacy Act and the Electronic Communications Privacy Act of 1986, permit the use of Customs Summonses.[7] (Id. at 7-13). Finally, the government asserts that (1) even if Cray had a privacy interest in the information

---

[7]The Court uses the government's terminology of "standing" but notes the Supreme Court's admonition, "But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." Rakas v. Illinois, 439 U.S. 128, 139 (1978).

obtained through the Customs Summonses, (2) and even if the Customs Summonses were so infirm as to require excising the information obtained by the Customs Summonses from the Search Warrant, and (3) even if the result of the excision of that information resulted in insufficient facts upon which to find probable cause, his motion to suppress would fail because of the United States v. Leon, 468 U.S. 897 (1984) good faith exception. (Id. at 13-14).

### 1.    Failure to Establish a Privacy Interest

First, Cray must establish that he has a valid privacy interest in the information obtained through the Customs Summonses such that he should be able to challenge the search based on the Customs Summonses. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, the Fourth Amendment "protects people, not places. "The Amendment does not protect the merely subjective expectation of privacy, but only those expectation[s] that society is prepared to recognize as reasonable." Oliver v. United States, 466 U.S. 170, 177 (1984) (internal quotation marks and citations omitted). What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). Thus, the proper inquiry is whether there is a subjective expectation of privacy which society is prepared to recognize as legitimate in the place or item searched. Smith v. Maryland, 442 U.S. 735, 740 (1979).

Concerning the issue whether he had a valid privacy interest Cray again argues that the Right to Financial Privacy Act and the Electronic Communications Privacy Act of 1986

11

provide a privacy right protected by the Fourth Amendment. (Doc. no. 26, pp. 8-9). Cray made the same argument at the September 8, 2009 evidentiary hearing; when the Court asked defense counsel at the hearing whether Cray had a valid privacy interest he could not identify any specific privacy interest. Rather, defense counsel responded, "Yes and no," and then proceeded – without ever answering the question to identify Cray's privacy interest – to argue that the investigators' use of Customs Summonses violated the Right to Financial Privacy Act and the Electronic Communications Privacy Act of 1986. (FTR 3:24:15 - 3:26:17). Therefore, defense counsel argued that these purported violations should "ultimately lead to the suppression of the search warrant." (Id.). However, as explained below, neither of these statutes provide a privacy right protected by the Fourth Amendment.

"Every federal court to address [whether identifying information such as the defendant's name, address, etc., is protected by the Fourth Amendment] has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation." United States v. Perrine, 518 F.3d 1196, 1204 (10th Cir. 2008) (citations omitted). In the instant case, the information gained pursuant to the Customs Summonses and used to support a probable cause finding for the search warrant was Cray's subscriber information, residence address, and bank records. Thus, Cray has no protected interest in the subscriber information he provided to AT&T.

To the extent that Cray argues that the investigators' use of the Customs Summonses to obtain information protected by the Right to Financial Privacy Act and the Electronic Communications Privacy Act of 1986 violated congressionally bestowed privacy rights that are protected by the Fourth Amendment, his argument must fail. (Doc. no. 26, pp. 8-9).

Importantly, a right bestowed by Congress does not create a constitutional right, and does not trigger the exclusionary rule. "The rights created by Congress are statutory, not constitutional." United States v. Kington, 801 F.2d 733, 737 (5th Cir. 1986) *cert. denied*, 481 U.S. 1014. The Eleventh Circuit has held that a statutory violation by itself is insufficient to justify the exclusion of any evidence obtained in that manner. United States v. Thompson, 936 F.3d 1249, 1251 (11th Cir. 1991) (citing Kington, 801 F.2d at 737). Violation of a statute will not result in suppression unless the statute itself specifies exclusion as a remedy. Kington, 801 F.2d at 737. The remedies in these two statues are not exclusion.[8] United States v. Daccarett, 6 F.3d 37, 52 (2d Cir. 1993); United States v. Sherr, 400 F.Supp.2d 843, 848 (D. Md. 2005).

To benefit from the protection provided by the Fourth Amendment, Cray must show that he suffered a violation of a constitutional right. At best, Cray alleges that he suffered a violation of a statutory right. Thus, Cray has not shown any valid privacy interest that invokes the Fourth Amendment protection.[9]

## 2. Proper Use of Customs Summonses

Assuming Cray had a valid privacy interest, which as described above, he does not, the Court turns to his argument that ICE improperly used Customs Summonses to obtain banking information and stored electronic communications to establish probable cause to

---

[8] The Right to Financial Privacy Act and the Electronic Communications Privacy Act of 1986 provide only civil remedies.

[9] Notably, the presiding District Judge in CR 109-074, in adopting the Court's prior Report and Recommendation, agreed that Defendant not shown any valid privacy interest that invokes the Fourth Amendment protection. (CR 109-074, doc. no. 63).

obtain the Search Warrant. Cray maintains: (1) Customs Summonses are only to be used

for administrative purposes related to trade, (2) the Right to Financial Privacy Act, 12

U.S.C. § 3402, prohibits access to citizen's financial information unless certain requirements

such as notification to the customer, search warrant, or judicial subpoena are used, and (3)

the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2701, prohibits the

disclosure of stored electronic communications without a court order, a specifically

authorized subpoena, search warrant, grand jury subpoena, or other judicially monitored

activity. (Doc. no. 26).

### a.     Cray's Argument that Customs Summonses Serve Only for Administrative Purposes Related to Trade

Cray argues that the Customs Summonses used by ICE agents to gain his banking and

subscriber account information were improper because Customs Summonses are supposed

to be used for administrative purposes related to trade. (Id. at 2). As explained *supra*, during

the investigation of this case, ICE issued various Customs Summonses pursuant to 19 U.S.C.

§ 1509.

Contrary to Cray's assertion, under 19 U.S.C. § 1509, a Customs Summons may be

used in an investigation or inquiry conducted for the purpose of insuring compliance with

the laws of the United States. As noted by the government, ICE utilized the subject Customs

Summonses[10] to gather documents and information relevant to an investigation of the likely

importation of child pornography images which (1) had file names with the country names

---

[10]ICE has regularly used its summons authority to obtain subscriber information on Internet accounts. See e.g., United States v. Terry, 522 F.3d 645, 646-47 (6th Cir. 2008); United States v. Salcido, 506 F.3d 729, 731-32 (9th Cir. 2007); United States v. Hamilton, 413 F.3d 1138, 1141 (10th Cir. 2005).

of "asia" and "brasil" in them; and (2) depicted child victims from Poland and the United Kingdom. (CR 109-074, doc. no. 54, pp. 2, 8-9). Indeed, ICE has been traditionally responsible for investigating wrongdoing on a national and even global stage, and has had substantial duties in investigating and serving search warrants upon alleged purveyors of child pornography. Hallock v. United States, 253 F.Supp.2d 361, 365 (N.D.N.Y. 2003) (citing United States v. Demerrit, 196 F.3d 138 (2d Cir. 1999)).[11] Therefore, the Customs Summonses were used to further a legitimate investigative purpose in compliance with the statute.[12] As such, Cray's argument that the ICE agents improperly used Customs Summonses to obtain the information that was ultimately used to secure the search warrant at issue fails.

### b. Cray's Argument Concerning the Right to Financial Privacy Act

Next, Cray agues that Customs Summonses should not have been used because the Right to Financial Privacy Act, 12 U.S.C. § 3402, prohibits access to citizen's financial information unless certain requirements such as notification to the customer, search warrant,

---

[11]Cray asserts that the only mention of any form of international trade was the statement in the McManaway Affidavit that the operators of a particular website were considering using a United Kingdom merchant processing account, but chose to use a United States service. (Doc. no. 26, p. 3). However, as noted above, the government provides that the importation of child pornography images depicted child victims from Poland and the United Kingdom. (CR 109-074, doc. no. 54, pp. 2, 8-9).

[12]The Court is not persuaded by Cray's argument that pursuant to 19 U.S.C. § 1509, third- party summonses are limited to custom brokers, attorneys, or accountants. (Doc. no. 26, pp. 2-3, 7). Indeed, the statute does expressly list brokers, attorneys, or accountants as potential recipients of the summons. However, the statute does not limit the recipient for Customs Summonses to brokers, attorneys, or accountants, rather it simply defines brokers, attorneys, or accountants as "third-party recordkeepers" and sets forth a notice requirement for third-party recordkeepers, an element that is not at issue here.

or judicial subpoena are used. (Doc. no. 26, pp. 7-8). Therefore, according to Cray, because the ICE agents simply used an administrative summons, Cray was not provided the requisite notice. However, 12 U.S.C. § 3405 provides that a government authority may obtain financial records under § 3402(2) pursuant to an administrative subpoena if there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry.[13] Also noteworthy, 12 U.S.C. § 3413(g) provides that the notice requirement shall not apply when a government authority, by a means described in 12 U.S.C. § 3402 and for a legitimate law enforcement inquiry, is seeking only the name, address, account number, and type of account of any customer.

Here, the only Customs Summons that has any relation to the Right to Financial Privacy Act is the Customs Summons that was issued for FNB. The Customs Summons requested "all subscriber and associated information relating to the following address, name,

---

[13] 12 U.S.C. § 3402 provides:

Except as provided by section 3403(c) or (d), 3413, or 3414 of this title, no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and

. . . .

(1) such customer has authorized such disclosure in accordance with section 3404 of this title;
(2) such financial records are disclosed in response to an administrative subpena [sic] or summons which meets the requirements of section 3405 of this title;
(3) such financial records are disclosed in response to a search warrant which meets the requirements of section 3406 of this title;
(4) such financial records are disclosed in response to a judicial subpena [sic] which meets the requirements of section 3407 of this title; or
(5) such financial records are disclosed in response to a formal written request which meets the requirements of section 3408 of this title.

16

account number, Bank statements for March and April, transaction of $79.99 to [merchant account], from [] Cray [October 28, 2008] credit/debit account [number provided]." (CR 109-074, doc. no. 54, p. 10). The information sought was intended to further a legitimate investigation and to verify the credit card and transaction information related to Cray's purchase of the subscription to the Website. (Id.). As the information sought pursuant to the Customs Summons complied with the statute and was limited in scope to verify account information about a specific transaction, suppression of that information is not warranted.[14]

Finally, even though Cray argues that the evidence obtained pursuant to the search should be suppressed because the investigators' use of Customs Summonses violated the Right to Financial Privacy Act, all courts to address this issue have determined that a violation of the Financial Privacy Act does not warrant suppression. United States v. Daccarett, 6 F.3d 37, 52 (2d Cir. 1993) (noting because the Right to Financial Privacy Act states that civil penalties are "the only authorized" remedy for its violation, see 12 U.S.C. § 3417(d), it would be inappropriate for the courts to imply a suppression remedy as well); see also United States v. Frazin, 780 F.2d 1461, 1466 (9th Cir. 1986) (concluding only

---

[14]To the extent that FNB provided information that exceeded the request made pursuant the Customs Summons, ICE only included in its Search Warrant Affidavit the specific information requested from the bank (i.e., the information provided in the Search Warrant Affidavit pursuant to the Customs Summons was within the parameters set in 12 U.S.C. § 3413(g)). (CR 109-074, doc. no. 54, p. 11 n.6). Additionally, the information provided pursuant to the FNB Customs Summons issued on March 3, 2009, is cumulative, as ICE agents had already obtained by other avenues, the information provided by the FNB Customs Summons. As noted by the government, between May and July of 2008, ICE agents were able to determine that Cray "subscribed to the [Website] on March 25, 2008, using a certain email address and credit card, and accessing the website through an identified IP Address and email account." (CR 109-074, doc. no. 54, p. 3). The information provided in the FNB Customs Summons merely corroborated the information that had previously been discovered.

remedy under the Right to Financial Privacy Act is provided in statute), *cert. denied*, 479 U.S. 844 (1986); Kington, 801 F.2d at 737. Thus, assuming for the sake of argument that there was a violation of the Right to Financial Privacy Act, suppression on this basis is not warranted.

### c. Cray's Argument Concerning the Electronic Communications Privacy Act of 1986

Cray also argues that Customs Summonses should not have been used because the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2701, prohibits the disclosure of stored electronic communications without a court order, a specifically authorized subpoena, search warrant, grand jury subpoena, or other judicially monitored activity. (Doc. no. 26, p. 8). As noted by the government, 18 U.S.C. § 2703(c) allows a governmental entity to require a provider of electronic communication services or remote computing service to disclose, pursuant to administrative subpoenas, information pertaining to a subscriber or to a customer such as name, address, telephone connection records, or records of session times and duration, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment (including credit card or bank account numbers). United States v. Bobb, 577 F.3d 1366, n.1 (11th Cir. 2009) (recognizing that under 18 U.S.C. § 2703(c)(2), the government can obtain an administrative subpoena, if authorized by federal and state statute, requiring an electronic communication service provider to disclose subscriber information). Additionally, a governmental agency receiving records or information pursuant to the above subsection is not required to provide notice to a subscriber or customer. 18 U.S.C. § 2703(c)(3). Here,

the Customs Summons issued to AT&T (Cray's internet provider) did not exceed the parameters set forth by the statute.

Cray's argument that the evidence obtained from the search of his home should be suppressed because the investigators' use of Customs Summonses violates the Electronic Communications Privacy Act of 1986, also fails because the Electronic Communications Privacy Act of 1986 is a Congressionally bestowed right, and the remedy for any purported violation of the Act, is a civil action for damages, not suppression. 18 U.S.C. 2708; see also United States v. Sherr, 400 F.Supp.2d 843, 848 (D. Md. 2005); United States v. Beckett, 544 F.Supp.2d 1346, 1350 (S.D. Fla. 2008). Thus, as previously noted, suppression on this basis is not warranted.

### B. Good Faith Exception

Even if the Court had determined that ICE agents had improperly relied on Customs Summonses, the evidence discovered as a result of the execution of the contested search warrant would be admissible under the "good-faith" exception to the exclusionary rule set forth in United States v. Leon, 468 U.S. 897 (1984).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and the judicially created remedy known as the exclusionary rule acts as a deterrent to violating the Fourth Amendment by preventing the use of evidence seized as a result of an illegal search. United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, under Leon, the good-faith exception allows the introduction of evidence in the prosecution's case in chief that is "seized by officers reasonably relying on a warrant issued

by a detached and neutral magistrate." Leon, 468 U.S. at 913. The Leon Court explained that the good-faith exception to the exclusionary rule was appropriate because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Id. at 916. Thus, under Leon, the question becomes whether the officers executing the warrant reasonably relied on the magistrate judge's determination of probable cause. See id. at 913.

Under Leon, there are four scenarios under which the good-faith exception to the exclusionary rule would not apply. Id. at 923. The exception does not apply where the judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Id. Nor does the exception apply in cases where the issuing judge "wholly abandoned" his or her detached and neutral judicial role such that no reasonably well trained officer would rely on the warrant. Id. The warrant must not be based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and the warrant must not be so "facially deficient" that the executing officers could not reasonably presume it was valid. Id.

Here, although Cray argues that the ICE agents improperly relied on 19 U.S.C. § 1509 to pursue evidence (an argument that has been discredited by the Court), Cray has not alleged dishonest or reckless behavior, and nothing in the record points to any such behavior. Nor is there any suggestion or evidence that the magistrate judge "wholly abandoned" his detached and neutral role in issuing the warrant. There is also nothing to suggest that the warrant was in any way "facially deficient" such that the executing officers could not

20

reasonably presume its validity. Nor has it been alleged that the warrant was so lacking in indicia of probable cause so as to render belief in its existence entirely unreasonable, the good faith exception could be applied in this case. See Leon, 468 U.S. at 923. Accordingly, it was not unreasonable to believe that probable cause existed.

In sum, the Court **FINDS** that even if ICE agents had improperly relied on Customs Summonses to pursue evidence, a position discredited *supra*, the evidence discovered as a result of the execution of the contested search warrant would be admissible under the good-faith exception to the exclusionary rule set forth in Leon.

### C. Jackson-Denno Inquiry

Cray also requested a hearing pursuant to Jackson v. Denno, 378 U.S. 368 (1964), to contest the voluntariness of his statements made to SA McManaway during the execution of the search warrant. (Doc. nos. 26, 31). As described above, the Court heard testimony from SA McManaway concerning the events surrounding the execution of the search warrant. Cray did not take the stand or provide any factual support for defense counsel's contention that Cray's incriminating statements were not made voluntarily.[15] Indeed, SA McManaway's testimony stands uncontested despite Cray's belated arguments that there was a lack of prior testimony as to the events that led to his return to his home from Fort Gordon on the morning of the search.

Under Miranda v. Arizona, prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent,

---

[15]Indeed, as previously noted, Cray did not provide any specific factual details, nor did he testify at the September 8, 2009 hearing, and therefore his conclusory statements have not been subjected to cross-examination.

that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). A defendant is in custody for the purposes of Miranda when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing California v. Beheler, 463 U.S. 1121, 1125 (1983) (quotation marks omitted)); see also United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001). Whether Cray was in custody during the search of his residence "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." McDowell, 250 F.3d at 1362 (quotation marks and alterations omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." Id. (emphasis added).

Here, SA McManaway testified that once the FBI agents contacted Cray at his place of employment, Cray was asked to return to his residence, and did so by himself, in his own vehicle. Upon arrival at his residence, Cray was informed by SA McManaway that he did not need to stay once the agents were inside; SA McManaway told Cray he was free to leave. However, rather than leaving, Cray was willing to talk to the agents and actively chose to stay and answer questions; indeed, prior to the conversation, Cray retrieved a notebook for note-taking purposes. Thereafter, Cray and SA McManaway sat down at Cray's kitchen table

and began discussing the case.

Importantly, SA McManaway testified that Cray understood that he was not required to stay. Furthermore, during their conversation, Cray was fully engaged in the conversation and answered SA McManaway's questions. Additionally, although Cray argues that he was "patted-down" at the conclusion of the search, SA McManaway explained that it was not a "pat-down;" rather, Cray was asked to empty pockets because the agents were searching for any external drives, thumb drives, or media devices. Cray also argues that he was in custody because at the conclusion of the search, SA McManaway called the SAUSA to "discuss what to do with [Cray]." (CR 109-074, doc. no. 87, p. 14). However, as explained by SA McManaway, he called the SAUSA to tell her that he would not have charges at that time, and that they would be leaving the residence. SA McManaway also noted that it was the SAUSA who called approximately 15 minutes later to request that Cray return to "duty status."

For these reasons, the Court finds that Cray was not in custody or restrained during the execution of the search and that he was specifically advised that he was free to leave once the agents had access to his residence. Cray also understood that he did not have to remain in the residence, but he voluntarily chose to stay during the search and voluntarily spoke with SA McManaway. Simply put, the Court heard no testimony from any witness suggesting that intimidation, coercion, and/or deception were used on Cray, or that Cray did not understand that he was free to leave the residence once the agents had access into the residence. To the contrary, the only evidence in the record is that Cray was informed that he was free to leave. However, not only did he willingly agree to remain at his residence, but

he actively chose to speak with SA McManaway.[16]

In sum, the Court concludes that Cray's incriminating statements to SA McManaway were made freely and voluntarily, with a full awareness he was free to leave his residence at any time. As such, there is no basis for this Court to recommend suppression of Cray's statements.

## IV.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Cray's request for a new evidentiary hearing (doc. no. 31) be **DENIED**, and that the motion to suppress (doc. no. 26) be **DENIED**.

SO REPORTED and RECOMMENDED this 25th day of May, 2010, at Augusta, Georgia.

_____
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[16]Cray was advised that he could remain at his residence and was not required to speak to the agents; however, he would not have been permitted to wander freely due to safety concerns for the agents searching the residence.